UNITED STATES of America,
Plaintiff,

v.

Hector SOLIS, Jr. and Lorenzo
F. Martinez, Defendants.

No. 98–40066–01/02–SAC.

United States District Court,
D. Kansas.

May 27, 1999.

Gregory G. Hough, Office of United States Attorney, Topeka, KS, for Plaintiff.

John J. Ambrosio, John J. Ambrosio, Chartered, Topeka, KS, Pro se.

Henry O. Boaten, Gregory G. Hough, Office of U.S. Atty. Office, Topeka, KS, for Defendants.

Hector Solis, Jr., Topeka, KS, Pro se.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This controlled substance case comes before the court on the motion to dismiss the indictment or, in the alternative, to suppress tampered evidence filed by the defendant Lorenzo Martinez (Dk.54), on the motion to join filed by the defendant Hector Solis (Dk.61), and on the response filed by the government (Dk.55). The defendants are jointly charged with twelve separate counts of drug trafficking offenses involving marijuana and cocaine. In their motion to dismiss, the defendants baldly allege that the drug evidence in this case "was among other evidence which has been tampered with by Shawnee County Sheriff deputies." (Dk.54, p. 1). On the sheer weight of this allegation alone, the defendants argue this court cannot ensure them the fair trial guaranteed under the Fifth and Sixth Amendments of the United States Constitution.

**MOTION TO JOIN (Dk.61).**

The court grants the defendant Solis's motion to join subject to the condition in the court's Criminal Procedural Guidelines that "[t]he joining party will not be allowed to raise any legal or factual arguments that are additional to or different from those found in the original motion, unless they are advanced in the motion to join." The defendant Solis advanced no specific arguments in his motion to join.

**MOTION TO DISMISS (Dk.54).**

*Arguments*

The defendants premise their motion on two allegations unique to this case

and on the proceedings held in a Shawnee County District Court criminal case. Detective Daniel Jaramillo and Officer Phil Blume with the Shawnee County Sheriff Office ("SCSO") were members of the Federal Bureau of Investigation's Task Force on violent crimes and were assigned the investigation of this case and the collection of evidence in it. The drug evidence was kept in the SCSO evidence locker room before it was sent to the Kansas Bureau of Investigation ("KBI") laboratory for testing and after it was returned from the KBI laboratory. The balance of allegations presented in their motion concern matters introduced in the state proceedings of *State of Kansas v. Carlos Hernandez*, No. 95–CR–1809, pending in the District Court of Shawnee County, Kansas.

At the request of the Shawnee County District Attorney's Office in March of 1996, the KBI investigated the theft of cocaine from the SCSO evidence locker room. The defendants summarize the interviews taken during that investigation. The defendants also cite an excerpt of Detective Jaramillo's testimony in the *Hernandez* proceeding. From these matters, the defendants argue that former Deputy Tim Oblander took controlled substances from the evidence room, tampered with the evidence, and even added foreign substances to the evidence. The defendants recognize that these matters do not show the extent of Deputy Oblander's alleged conduct, as he alone knows and refuses to testify about his conduct. It is enough in the defendants' judgment that the evidence in this case was located in the same evidence room around the same time as the alleged tampering with other evidence occurred.

Even assuming the evidence here was subject to tampering, the defendants concede they have no idea "[w]hether the untampered evidence would have been exculpatory." (Dk.54, p. 11). The defendants advocate a standard other than articulated in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281

(1988). They argue the issue here does not fit the rule in *Youngblood* and seek a standard that dispenses with any requirement to prove bad faith. Alternatively, they argue that Deputy Oblander's alleged conduct constitutes bad faith.

In response, the government makes several points. The evidence collected in this case was marijuana and cocaine, but the state court proceedings have indicated that Deputy Oblander's alleged problems were cocaine base abuse. At the government's request, a KBI chemist has examined again the drug evidence in this case finding no significant disparities in weight or any indication that the evidence had been handled other than in an effort to preserve it. The government observes that the chain of custody issue should be decided at trial in accordance with the law as stated in *United States v. Johnson*, 977 F.2d 1360, 1367 (10th Cir.1992), *cert. denied*, 506 U.S. 1070, 113 S.Ct. 1024, 122 L.Ed.2d 170 (1993):

> [W]hen the evidence "is not readily identifiable and is susceptible to alteration by tampering or contamination, the trial court requires a more stringent foundation 'entailing a "chain of custody" of the item with *sufficient completeness* to render it *improbable* that the original item has either been exchanged with another or been contaminated or tampered with.'" *Id.* [*United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir.), *cert. denied*, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989).] (quoting Edward W. Cleary, *McCormick on Evidence* § 212, at 667 (3d ed.1984)) (emphasis added in *Cardenas*).

However, "the chain of custody need not be perfect for the evidence to be admissible." *Id.* If the trial court—after "consider[ing] the nature of the evidence, and the surrounding circumstances, including presentation, custody and probability of tampering or alteration"—"determines that the evidence is substantially in the same condition as when the crime was committed, the

court may admit it." *Id.* Once the court properly decides that the evidence is admissible, "deficiencies in the chain of custody go to the weight of the evidence, not its admissibility; the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence." *United States v. Brandon,* 847 F.2d 625, 630 (10th Cir.), *cert. denied,* 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1988).

Finally, the government observes that the actual amount of marijuana or cocaine is not an issue submitted to the jury. Rather, the jury will only be required to decide if a measurable amount of the controlled substance was in fact the subject of the act charged in the particular count of the indictment.

*Hearing*

On April 15, 1999, the court heard counsels' arguments and testimony from Detective Daniel Jaramillo with the SCSO and Agent Richard G. Hundertfund assigned to the Federal Bureau of Investigation's Task Force on violent crimes. At that time, the court also took under advisement the defendants' offer of the transcripts from the *Hernandez* proceeding subject to the government's written objection and the defendants' responses, all of which were to be filed later.

The SCSO officers assigned the investigation resulting in these charges were Daniel Jaramillo and Phil Bloom. Jaramillo testified that the drug evidence in this case was either obtained in controlled buys by a cooperating witness or seized by officers pursuant to a search warrant. The drugs received in controlled buys were packaged at the FBI task force headquarters and then taken directly to the KBI where they were kept and tested. Jaramillo testified that probably sometime in 1997 the drugs were retrieved from the KBI and taken to SCSO's locker room. Jaramillo further testified that the drugs seized pursuant to a search warrant also were taken first to the KBI laboratory for testing and were not transported to the SCSO's locker room until quite sometime later. Jaramillo acknowledged that other personnel with the SCSO, including Deputy Oblander, had access to its locker room and that he would not necessarily know who could have handled those drugs while stored there.

On cross-examination, Jaramillo clarified that he has no reason to think this case is related to the Oblander incident about which he testified in *Hernandez.* Nor does Jaramillo have any knowledge of Deputy Oblander tampering with any evidence collected in this case. More specifically, Jaramillo noted that none of the evidence in this case was ever stored in Officer Holladay's locker and that Deputy Oblander did not have access to any of the drug evidence prior to the KBI weighing and testing it. Jaramillo said to the best of his knowledge he had no cause to question the accuracy or truthfulness of the KBI reports on the weight and analysis of the drug evidence. Jaramillo similarly concluded that he had no questions about the integrity of the drug evidence based on what he knew about the handling of the evidence and what he saw from the packaging of the evidence. Finally, Jaramillo said he was unaware of any evidence or information that would lead him to reasonably question the integrity the drug evidence here.

Agent Hundertfund testified that he took the drug evidence to the KBI when it was reviewed and weighed a second time in January of 1999. With regards to the packaging on some of the marijuana, Hundertfund observed that seals on paper sacks had come loose and that evidence tape was no longer adhering. Hundertfund placed these paper sacks with marijuana in larger plastic bags and sealed them. Hundertfund said it was not unusual for paper sacks to come apart with time and to be repackaged in plastic bags. Hundertfund testified that he and two scientists with the KBI laboratory reviewed the individual packages of drug evidence in

this case and found no signs of altering or tampering. For this reason, the drug evidence was not retested. Hundertfund knew of no credible information that the drug evidence had been adulterated or tampered with in any manner.

The government introduced without objection a letter dated March 18, 1999, from Kamala Hinnergardt, a forensic scientist with the KBI. She wrote this letter after recently examining the drug evidence a second time at the government's request. The letter reports that the marijuana evidence had been stored in brown paper bags, that vegetation had been leaking from some of the items because the KBI evidence tape was not adhering, and that those items which had been leaking were later placed in heat-sealed plastic bags. As a result, the KBI took gross weights of the different marijuana items, and all of the gross weights "were slightly more than the net weights done on the original dates of analysis." (Govt.Ex.1). The marijuana items that were not in heat sealed bags "appeared to have all seals intact." *Id.* Ms. Hinnergardt's letter also reports that gross weights of the cocaine evidence were taken and that the gross weights "were greater than the net weights done on the original dates of analysis." *Id.* The letter further states that the seals on the cocaine evidence "appeared to be intact." *Id.*

At the hearing, the defendants offered partial transcripts from the hearings conducted in the *Hernandez* case and reports, letters and other documents introduced in that same proceeding. The government objected at the hearing on relevance grounds. The court took the issue of admissibility under advisement giving deadlines for the defendants to assemble and submit these documentary exhibits in final form, for the government to file its written objection, and for the defendants to file their written response to any objection. The defendants timely submitted their documentary evidence, the government filed its written objection, but the defendants filed no response.

After looking over this documentary evidence in light of the testimony received in this case, the court sustains the government's objection on relevance grounds. The defendants have made no preliminary showing that the matters discussed and covered in *Hernandez* bear on the case here. There is no evidence showing that the drug evidence in the instant case has been tampered with or adulterated in any way. Nor is there any evidence that Deputy Oblander had anything to do with the investigation or the seizure and handling of evidence in this case.[1] Under these circumstances, the defendant's attempts to link this case with *Hernandez* and the

---

1. The facts in *Hernandez* as stated in the Memorandum Decision and Order issued by the state court on May 11, 1999, differ substantially from the case here. Deputy Oblander assisted in executing the search warrant on Hernandez's residence. There is no evidence that Deputy Oblander has any connection to the investigation or facts of the case. Detective Holladay placed the marijuana evidence found at Hernandez's residence in Holladay's personal locker before ever weighing, marking and packaging it. Jaramillo testified at the hearing here that he understood Sheriff Meneley to have told him that Deputy Oblander took drug evidence from Detective Holladay's evidence locker. Jaramillo further testified that none of the drug evidence in the instant case was ever stored in Holladay's locker and that all of the drug evidence went to the KBI and was weighed and tested there

before being placed in the SCSO evidence locker room. The state court in *Hernandez* found that "[w]ithout a conclusive 'natural' explanation, the evidence seized and stored in this case decreased in weight, and thus, has been materially altered by some external force." The defendants Solis and Martinez offer nothing from which this court can infer any material alteration. Finally, the evidence offered in *Hernandez* was limited to the three-year period between January of 1994 and December of 1996. According to Jaramillo's testimony, the evidence in this case was not placed in SCSO's evidence locker room until sometime in 1997. There is nothing of record to show that the conduct at issue in *Hernandez* continued into 1997. For all these reasons, the court does not consider the documentary evidence relevant for purposes of the defendants' motion to dismiss.

allegations against Deputy Oblander are little more than speculation.

*Governing Law*

 Using the Due Process clause of the Fourteenth Amendment, the Supreme Court has generated " 'what might loosely be called the area of constitutionally guaranteed access to evidence.' " *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (quoting *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). To the extent that there is a duty to preserve evidence constitutionally imposed upon the government, it "must be limited to evidence that might be expected to play a significant role in the suspect's defense," or in other words, evidence that is constitutionally material. *Id.* at 488–89, 104 S.Ct. 2528; *see United States v. Parker,* 72 F.3d 1444, 1451 (10th Cir.1995). Evidence is constitutionally material if its exculpatory value was apparent to the police before its destruction and if its nature is such that the defendant would be unable to obtain comparable evidence by other reasonable means. *Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528. The mere "possibility" that the lost evidence could have exculpated a defendant does not establish the apparent exculpatory value of the evidence. *United States v. Parker,* 72 F.3d at 1451 (citing *Arizona v. Youngblood,* 488 U.S. 51, 56, 109 S.Ct. 333, 102 L.Ed.2d 281 n. * (1988)). The availability of a witness to testify about the content of the destroyed evidence presents other reasonable means by which a defendant could have acquired comparable evidence. *Parker,* 72 F.3d at 1452.

 " '[I]f the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence.' " *United States v. Parker,* 72 F.3d at 1451 (quoting *United States v. Bohl,* 25 F.3d 904, 910 (10th Cir.1994) (citing *Youngblood,* 488 U.S. at 58, 109 S.Ct.

333)). Evidence is only potentially useful if "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333.

 The defendant bears the burden of showing bad faith on the part of the government in failing to preserve potentially useful evidence. *Id.* at 57–58, 109 S.Ct. 333. "[T]he district court's determination regarding bad faith is a mixed question of fact and law, in which 'the quintessentially factual question of intent' predominates." *United States v. Richard,* 969 F.2d 849, 853 (10th Cir.) (quoting *United States v. McKie,* 951 F.2d 399, 403 (D.C.Cir.1991)), *cert. denied,* 506 U.S. 887, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992). "The 'mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith.' " *United States v. Bohl,* 25 F.3d at 910 (quoting *United States v. Richard,* 969 F.2d at 853–54). "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith." *Id.* at 912. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was destroyed." 488 U.S. at 56 n. *, 109 S.Ct. 333.

*Discussion*

"A dismissal of the indictment for destruction or failure to preserve evidence is a rare occurrence." *United States v. Headdress,* 953 F.Supp. 1272, 1288 (D.Utah 1996). The federal case law discussed above is quite clear that these standards apply whenever a defendant argues a due process violation based on the government destroying or failing to preserve evidence. *See United States v. Pedraza,* 27 F.3d 1515, 1527 (10th Cir.), *cert. denied,* 513 U.S. 941, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994); *see, e.g., In re Sealed Case,* 99 F.3d

1175, 1178 (D.C.Cir.1996) (failure to preserve drug evidence in a particular form is subject to *Youngblood* bad faith test). Nor does this case law suggest these standards are displaced or subject to change because of the particular manner in which the government is alleged to have not preserved evidence. *See United States v. Gallant,* 25 F.3d 36, 39 n. 2 (1st Cir.1994) ("Neither *Youngblood* itself, nor its organizing principle, suggest that the act by which the potentially exculpatory evidence is destroyed need be inadvertent."). Finally, the state court case law cited by the defendants that suggests some standard other than bad faith lacks precedential force in this forum.

■ The defendants simply have not produced any convincing proof of record that the drug evidence in this case has been tampered with or altered in any manner. Trained KBI scientists found no evidence from the packaging that the drug evidence was handled in any manner other than to preserve it. That the gross weights in January of 1999 were "slightly more than the net weights done on the original dates of analysis" (Govt.Ex.1) is reasonably and naturally explained by the fact that the gross weights included the packaging material. Based on the record presented, the court can infer nothing improper from the simple fact that the gross weights were slightly more than the net weights. The defendants would have the court infer from Jaramillo's hearsay testimony about a single incident in 1995 that Deputy Oblander tampered with all drug evidence ever stored in SCSO evidence locker room, even that first stored there in 1997 after the KBI's 1996 investigation into the Oblander incident. Given the state of the record, in particular Jaramillo's and Hundertfund's testimony that they were unaware of any information causing them to question the integrity of the drug evidence in this case, the court is not prepared to make the inferential leap requested by the defendants.

Assuming for the sake of argument that the defendants had convincing evidence that the drugs here had been adulterated, the defendants still would be unable to demonstrate a due process violation. At the hearing, defendants conceded that any drug evidence allegedly destroyed or missing would not be exculpatory and that they must prove the government acted with bad faith. The defendants contend it is bad faith for officers to use cocaine that is drug evidence, to deny the defendants the opportunity to test the cocaine, and to adulterate the cocaine with foreign material.

The defendants have not demonstrated that the drug evidence, as constituted prior to any alleged opportunity for tampering or adulteration, is constitutionally material under *Trombetta.* All of the drug evidence here had been weighed and tested by the KBI laboratory before it was ever placed in the SCSO evidence locker room. The defendants identify no red flags in the KBI laboratory reports or articulate any factual basis for questioning the accuracy of the KBI's testing procedures or the conclusions drawn in those reports. In short, the defendants have not shown that the drug evidence had "apparent" exculpatory value before it was the subject of any alleged tampering or destruction. 467 U.S. at 489, 104 S.Ct. 2528; *United States v. Bohl,* 25 F.3d at 910. Nor is there anything of record "to indicate" that the alleged "lost evidence was even potentially exculpatory rather than inculpatory." *United States v. McKie,* 951 F.2d at 403. Indeed, the defendants have made no effort to demonstrate nor offered any plausible explanation for how the alleged missing drug evidence "could have been subjected to tests, the results of which might have exonerated" them. *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333; *see United States v. Bohl,* 25 F.3d at 910–11.

Assuming the defendants did show that the alleged missing drug evidence was potentially useful or exculpatory, they now must demonstrate bad faith on the part of

the government. *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333; *Bohl,* 25 F.3d at 910. Bad faith requires that the defendants prove more than mere negligence, they must show that "the police ... by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333. The court's "inquiry into bad faith 'must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" *Bohl,* 25 F.3d at 911 (quoting *Youngblood,* 488 U.S. at 57 n. *, 109 S.Ct. 333). The defendants do not show that anyone knew the drug evidence had exculpatory value when it was allegedly used or altered. Instead, the alleged conduct of Deputy Oblander tends to show knowledge that the evidence was inculpatory rather than exculpatory. Regardless whether the government can offer an innocent explanation for evidence being destroyed or altered, the burden of proof on bad faith remains on the defendants. *United States v. Aldrete,* 930 F.2d 35, 1991 WL 49755, at *2 (10th Cir. Mar. 21, 1991) (Table), *cert. denied,* 502 U.S. 851, 112 S.Ct. 157, 116 L.Ed.2d 122 (1991). As defense counsel stipulated at the hearing, none of the law enforcement officers involved in this case are implicated in any allegations regarding missing or altered drug evidence. Finally, there is no evidence offered here that any of the policies and practices regarding the SCSO evidence locker room or any of the actual supervision of the same was instituted with bad faith—in other words, to deprive the defendants of an opportunity to test the drug evidence that had been originally seized.

For all of the above reasons, the court finds no due process violation and, thus, denies the defendants' motion to dismiss. The court reserves for trial the issue of admissibility regarding this drug evidence.

IT IS THEREFORE ORDERED that the motion to join filed by the defendant Hector Solis (Dk.61) is granted;

IT IS FURTHER ORDERED that motion to dismiss the indictment or, in the alternative, to suppress tampered evidence filed by the defendant Lorenzo Martinez (Dk.54) is denied.